W. A. BASNIGHT ET AL. v. DARE LUMBER COMPANY.

(Filed 20 September, 1922.)

**1. Principal and Agent—Implied Authority of Agent—Contracts.**

An agent has not the implied authority to bind his principal by contracts that are so unusual or improbable in agencies of that character as would put an ordinarily prudent man upon his guard that such authority did not exist; and the person thus dealing with the agent is required to ascertain from the principal the extent of the agent's authority with regard to the subject-matter.

**2. Same—Timber.**

　　Where the defendant lumber corporation has an extensive plant for the cutting and hauling of its timber from large bodies of land, with a general agent in charge, a local agent with actual authority only to contract for the cutting, etc., over small parcels of land extending to periods of fifteen days, may not, by implied authority, bind his principal to a contract for the cutting of timber from a large body of timber requiring from three to eighteen years for its cutting, and the defendant, in the absence of an act of ratification, will not be bound thereby. *Chesson v. Cedar Works*, 172 N. C., 32, cited and applied.

**3. Principal and Agent — Evidence — Questions for Jury — Established Facts—Questions of Law—Trials.**

　　Whether an agent has attempted to bind his principal by an act beyond his express or implied authority is a question of fact for the jury, upon conflicting evidence; but whether the principal will be bound thereby is a question of law, under facts established or admitted.

APPEAL by defendant from *Daniels, J.,* at May Term, 1922, of DARE.

Civil action to recover damages for an alleged breach of contract. Upon denial of liability and issues joined, there was a verdict and judgment in favor of plaintiffs. Defendant appealed.

*B. G. Crisp, Thompson & Wilson, and Meekins & McMullan for plaintiffs.*
*Ehringhaus & Small for defendant.*

STACY, J. The facts in the case at bar are strikingly similar to those in *Chesson v. Cedar Works,* 172 N. C., 32, and, on authority of that case, we think the defendant's motion for judgment as of nonsuit should have been allowed.

There was evidence on behalf of the plaintiffs tending to show that in October, 1917, the plaintiff W. A. Basnight entered into a verbal contract with R. B. Cotter, whereby it was understood and agreed that the said Basnight should have the right and privilege of cutting "cooper logs" on a tract of land belonging to the defendant company and containing approximately 640 acres. With respect to the manner in which the contract is alleged to have been made, the plaintiff testified as follows:

"I went in Cotter's office and told him I would like to get a contract cutting some juniper. He said all right, sure you can get it. He said I could contract any place I wanted. I told him I wanted to contract up on 'Little Wide' on Mill Tail Creek. He asked me when did I want to go to work. I told him I would be ready the first day of November. He said all right, sir, he would let Mr. A. M. Cohoon go up with me and ramble the timber. That was all the conversation.

"Mr. Cohoon and I went up there and rambled the timber something like a week later. . . . We left Buffalo City 7 a. m., and got back

at three or four o'clock in the afternoon of the same day. Only rambled along the creek and for a short distance back. . . . Went to see Mr. Cotter again that afternoon. . . . I told him then I would like to have some understanding about it. He asked what that was. I told him I wanted to contract from 'Little Wide' through to 'Stokes Wide,' and as far back as the timber reached. He said all right, sir, you can have it. Then I said I want to know the price. He said 5½ cents a stick straight, delivered on Mill Tail Creek. There was nothing else in that conversation except that I said that I was ready to go to work at that price."

The plaintiff W. A. Basnight then formed a partnership with J. W. Ambrose for the purpose of cutting said timber and entered upon the work on or about 2 November, 1917. In the spring of 1918, after the plaintiffs had cut the timber back for a distance of 150 or 200 yards, Eph. Duval, who was a log-counter, brought them a note from Mr. Cotter in which he is alleged to have said (the note was not offered in evidence) : "We cannot pay this price any longer. We will pay for the first 200 yards, 4½ cents; for the second 200 yards 5 cents, and 5½ cents for all over that." Plaintiffs then quit cutting, having cut up to that time 38,557 logs, or an average of 7,711 per month, for which they have been paid in full. Plaintiffs testified that they could have finished the cutting in three years at a profit of approximately $15,000. But it is conceded that it would have taken eighteen years at the rate they were proceeding, with their force of sixteen men.

It also appears from the plaintiffs' testimony—there was none offered by the defendant—that the main sawmill of the Dare Lumber Company was located at Elizabeth City, N. C., forty or fifty miles away from its logging operations, and that Mr. C. P. Brown was in charge of the same. This was known to the plaintiffs; and, in their original complaint, they alleged that "R. B. Cotter and said Dare Lumber Company, at the time hereinafter set forth, were engaged in cutting and marketing timber, under an agreement between said defendants constituting a partnership, as plaintiffs are informed and believe."

The authority of Cotter to enter into the present contract and to bind the defendant lumber company thereby is the crucial point in the case. Plaintiffs concede that no actual authority has been shown, and that they are compelled to rely upon the doctrine of apparent or implied authority.

It was established that the defendant owned approximately 170,000 acres of timber lands in Dare County, and maintained there an extensive logging equipment, consisting of five locomotives, eleven skidders, and six barges. Two to four hundred men were employed in Dare County; Cotter had an office on the defendant's property at Buffalo City and was

apparently in charge of said logging and woods operations. He exercised the same authority as others who had preceded him in this work.

Two methods were employed in contracting the timber to be cut; one by laying off "breadths" along the railroad and the other by "bunches" where the company had no tract. W. D. Basnight, a witness for the plaintiffs, testified that he had cut some "bunches of juniper and my contracts always ran from pay-day to pay-day, which was every fifteen days." The language used in the instant case would seem to suggest that a similar procedure was to be followed here. Indeed, it appears that such was the fact. W. A. Basnight, one of the plaintiffs, testified: "We have been paid for every stick of juniper that we actually cut in the woods under our contract. Our claim is for damages for not letting us continue to cut under the contract at the said price." He further testified that they had put in a tram road; at what expense not stated, though it does appear that it would have cost $1,200 or $1,500 for the whole tract. There was also allegation and proof to the effect that plaintiffs were ready, able, and willing to complete the contract.

There was denial of any liability on the part of the Dare Lumber Company; both defendants alleging in their answers that Cotter had no authority to enter into any such contract on behalf of said company. The plaintiffs seem to have had some knowledge of Cotter's want of authority, as witness their allegation of an alleged partnership, of which there was no evidence offered on the trial. In fact, this allegation was abandoned, and plaintiffs now seek to hold the defendant lumber company liable by virtue of Cotter's apparent agency.

The defendant's mill was at Elizabeth City, under the general supervision and management of C. P. Brown, a fact known to the plaintiffs, and there was no evidence of Cotter's actual authority, as agent of defendant company, to make such a contract. Indeed, the casual manner of its making, coupled with its unusual and extraordinary provisions, if plaintiffs have interpreted it aright, would seem to suggest inquiry on their part. The circumstances were such as to put them on notice.

"The person dealing with the agent must also act with ordinary prudence and reasonable diligence. If the character assumed by the agent is of such a suspicious or unreasonable nature, or if the authority which he seeks to exercise is of such an unusual or improbable character as would suffice to put an ordinarily prudent man upon his guard, the party dealing with him may not shut his eyes to the real state of the case, but should either refuse to deal with the agent at all or should ascertain from the principal the true condition of affairs." Mechem on Agency, sec. 389.

Whether Cotter did in fact enter into the contract as alleged was, of course, a question for the jury, and they have found that he did, but

there is an absence of any sufficient evidence to establish his authority to act for the Dare Lumber Company in the execution of such an extraordinary contract. There is quite a difference between a contract which is to last for fifteen days and one that is to run from three to eighteen years. It is not even alleged that the defendant lumber company had any knowledge of this agreement, nor that it has in any way ratified the same. No benefits have accrued therefrom which have not been paid for in full. Cotter's power to bind the Dare Lumber Company in this unusual manner could not be implied merely from his connection with the logging operations under all the facts of the instant case.

There was a judgment of nonsuit as to the defendant R. B. Cotter, from which the plaintiffs have not appealed, though exception was duly noted at the time. Hence, the correctness of this ruling is not before us for review.

The principles governing the case at bar are fully discussed in *Chesson v. Cedar Works, supra,* and *Stephens v. Lumber Co.,* 160 N. C., 107; and, upon authority of those cases, we think the defendant's motion for judgment as of nonsuit should have been allowed.

Reversed.